BISHOP *v*. NEW YORK CENTRAL RAILROAD COMPANY.

RAILROADS—AUTOMOBILES—MULTITRACK CROSSING—OBSERVATION.
> Judgment of $8,000 for eastbound plaintiff motorist, who had stopped with other cars for 9 or 10 minutes west of 4-track railroad crossing late at night in January until freight train had passed, gate was up and gong had stopped ringing, who looked to his right before proceeding and saw nothing coming but did not look again until just before being hit on the fourth track, is affirmed.

KELLY, J., dissenting.

Appeal from Ingham; Salmon (Marvin J.), J. Submitted October 10, 1956. (Docket No. 4, Calendar No. 46,795.) Decided May 17, 1957.

Case by Jacob L. Bishop and his insurance company subrogee against the New York Central Railroad Company, a Michigan corporation, for personal injuries and property damage arising from collision at railroad crossing. Verdict and judgment for plaintiffs. Defendant appeals. Affirmed.

*Gregg, Glassen, Parr & Rhead* (*H. W. Glassen,* of counsel), for plaintiffs.

*Seelye, Kelley & Joseph* (*George H. Wyatt,* of counsel), for defendant.

---

REFERENCES FOR POINTS IN HEADNOTES
5A Am Jur, Automobiles and Highway Traffic § 376 *et seq.*

KELLY, J. (*dissenting*). Plaintiff's automobile and defendant's locomotive collided as plaintiff crossed defendant's tracks at Shiawassee street, in the city of Lansing, about 2:15 a. m., January 30, 1954. A jury awarded plaintiff $8,000.

Plaintiff and his wife were on their way home and were driving east on Shiawassee street. They brought their automobile to a stop approximately 40 feet west of the track gates because a freight train was passing and the gates were down, the red warning lights flashing, and the bell ringing.

Plaintiff waited for 9 or 10 minutes while the freight train passed. The gates went up and the testimony discloses, beyond dispute, that when plaintiff placed his car in gear to proceed forward to cross the tracks he looked to his right (south) and could see down the tracks for a distance of 60 to 70 feet, but that he did not look again between the time he started his car and the time it was struck by the locomotive.

There were several tracks crossing Shiawassee street and plaintiff testified:

"As I came on the crossing I did not make a further observation. When the gates lifted and the lights stopped, I drove across and was struck on the fourth track."

The locomotive, going north, was traveling at a slow rate of speed, 3 to 4 miles per hour, and was brought to a stop almost immediately after striking plaintiff's car and before the locomotive had crossed Shiawassee street.

The record establishes that there was a bright, white light, 16 inches in diameter, on both ends of the locomotive and that the engine bell was ringing continuously as the locomotive proceeded along the tracks. Plaintiff does not dispute this fact, but merely states that he does not know whether there was a

light on the locomotive, nor does he know whether the bell was ringing.

There was a man in the tower at this crossing but the gates were partially automatic and 47 feet south of the center of Shiawassee street was a device which automatically lowered the gates as a train reached this point. The gate crossing equipment was in perfect working order, both before and after the accident.

Defendant's witnesses testified that the gates, which had been lowered while plaintiff waited for the freight train to pass, were again being lowered as plaintiff proceeded forward to cross the tracks and that the plaintiff narrowly missed being struck by them. This is denied by plaintiff.

Appellant contends that plaintiff's admitted failure to look before entering and while crossing the tracks constituted contributory negligence and that the trial court erred in refusing to so find and in refusing to grant its motion for judgment *non obstante veredicto*.

Plaintiff contends that he relied on the safety devices and that the lifting of the gates was a signal to him that it was safe to proceed. He testified:

"I wouldn't say I wasn't looking for it but I would say this: In other words, when I am at those protected crossing gates, and they raise those gates, and the traffic begins moving, in other words, when they raise those gates and the lights quit blinking and the traffic starts moving, to me it indicates an all-clear sign, a signal to me."

In *Beagle* v. *Pere Marquette R. Co.*, 184 Mich 17, 24, 25, this Court stated:

"It is said that the plaintiff had the right to rely upon the custom of the defendant to ring the bell. The exact effect of the defendant's negligence upon the duty of the plaintiff in the premises is well point-

ed out in *Ellis* v. *Boston & M. R. Co.,* 169 Mass 600, 602 (48 NE 839), where it is said:

" 'While the raising of the gates justified the plaintiff in attempting to cross when he did, and while that fact, and the facts that no whistle was sounded and no bell was rung, are to be taken into consideration on the question of how much he must himself look and observe as he makes his way across, these circumstances do not excuse him from looking and listening, and taking thought for his own safety. He cannot rely wholly upon them, and cannot recover without showing more, as to his own conduct, than that he so relied.  *  *  *  We are of opinion that, as matter of law, there was no evidence from which it could be found that the plaintiff himself exercised due care, and the verdict for defendant was rightly ordered.'

"I am of opinion that the motion made by defendant for a directed verdict on the ground that plaintiff was guilty of contributory negligence as a matter of law should have been granted."

In *Lockett* v. *Grand Trunk Western R. Co.,* 272 Mich 219, this Court established the principle that a traveler approaching a protected railroad crossing is entitled to place some reliance upon the indication of safety implied by silent signal and the degree of care required is that of an ordinarily prudent man under the circumstances and not the extreme care required at unprotected crossings, and whether proper care has been exercised is ordinarily a jury question. But, whether the question is one of fact or law depends upon the circumstances of each particular case. The Court, passing upon how much a traveler can rely upon the protective or safety devices, stated (pp 223, 225):

"It is true that we have held that a traveler approaching a protected crossing is entitled to place some reliance upon the indication of safety which the silence of the signal implies, and that the degree

of care required of one approaching a crossing under such circumstances 'is only that which an ordinarily prudent man would use under such circumstances, and not the extreme care that would be required if there were no device there to indicate safety; and that whether proper care has been exercised under such circumstances is ordinarily a jury question (*Baltimore & Ohio R. Co.* v. *Windsor,* 146 Md 429 [126 A 119]).' *McPeake* v. *Grand Trunk Western R. Co.,* 242 Mich 676. Also, *Motyka* v. *Detroit, G. H. & M. R. Co.,* 256 Mich 417; *Ackerman* v. *Michigan Central R. Co.,* 249 Mich 693. However, an accident at a so-called 'protected crossing' does not necessarily in all cases present a question of fact for the jury on the issue of contributory negligence. *Day* v. *Pere Marquette R. Co.,* 252 Mich 589; *Baltimore & Ohio R. Co.* v. *Windsor, supra; Crowley* v. *Chicago, B. & Q. R. Co.,* 204 Iowa 1385 (213 NW 403, 53 ALR 964). But whether contributory negligence is a question of law for the court or one of fact for the jury depends upon the circumstances of the particular case. * * *

"While it is difficult to lay down a positive rule which may be applied to all cases, it must be remembered that railroad trains, of necessity, are operated at a high rate of speed, in accordance with public demand; that they proceed over their own right-of-way; and that mechanical devices installed to warn the public may get out of order. Therefore, while an approaching train must give proper warning, and while the silence of the protective device is an indication to the traveler that no train is approaching, nevertheless the driver is not thereby relieved of the duty of making due observation, but must use his own senses of sight and hearing to ascertain for himself whether a train is in fact approaching, and if he fails to look at all where he has an unobstructed view and where he could undoubtedly have seen the train in time to avoid an accident, had he made any observation, he is guilty of contributory negligence as a matter of law."

In *Stone* v. *Duluth, South Shore & Atlantic R. Co.,* 248 Mich 538, plaintiff testified that as he approached the railroad tracks he noticed that the gates were up and that he looked in both directions before starting to cross the tracks and saw no train but did notice that on the third track to his right there was a boxcar; that he proceeded on his way and crossed the third track before discovering a train approaching from the east. In determining whether the trial court erred in directing a verdict for defendant, this Court said:

"We think the trial court correctly disposed of the issue. The engine, drawing a freight train, approached the crossing from the east, which was to the right of the driver of the automobile. He testified that he did not look to the right once after crossing the first track. When he reached the third track, his view to the right was obstructed to some extent by the boxcar, but beyond the boxcar, between the third track and the defendant's track, was a safety zone of 38 feet. There his view was unobstructed. There was the train, but he did not see it because he did not look. He drove ahead heedlessly until he was within 12 feet of the track, when the plaintiff called to him from the rear seat. Then, and for the first time, he saw the train. It was too late to avoid the collision. If either the driver or the plaintiff had looked after they passed the boxcar, while they were in a zone of safety, they would have seen the train and been able to avoid the accident. The trainmen saw them, and had it not been for their prompt action and the slow speed of the train, the result of the collision probably would have been more serious. The train was stopped within the length of the engine. The record presents a clear case of contributory negligence on the part of both the driver and the owner of the car. The court made no mistake in directing a verdict for the defendant."

Plaintiff's only observation to ascertain whether a train was coming was made 40 feet before he entered onto the first track. Had he looked to his right as he entered onto the first track there would have been nothing to prevent him from seeing the train approaching. This is evidenced by the following question put to plaintiff and his answer thereto:

"*Q.* Isn't this true, Mr. Bishop, that when you reached the point of this crossing in the vicinity of where that gate is located that then there is nothing to obstruct your view for a great distance down that track?

"*A.* That's right, yes, after you get under those gates, there is nothing."

The gates did not relieve plaintiff of his duty to make due observation or excuse him for his failure to use his own senses of sight and hearing to ascertain whether a train was in fact approaching.

The court erred in not granting defendant's motion for a judgment *non obstante veredicto.* The judgment entered by the trial court should be vacated, and the case should be remanded for entry of judgment for defendant notwithstanding the verdict of the jury. Costs to appellant.

Edwards, J. In this case, otherwise important only to the parties to the extent of $8,000, there is involved the right of trial by jury. Hence, we approach it with the care and reverence which the age of the common-law jury and its great historic and continuing contribution to justice both demand.

"A jury trial is a proceeding in which the jurors are the judges of the facts and the court is the judge of the law." 31 Am Jur, Jury, § 2, p 550.

"The right to jury trial is immemorial. It was brought from England to this country by the colonists, and it has become a part of the birthright of

every free man. It is a right which is justly dear to
the American people, and one which is expressly
guaranteed by the Federal Constitution and by the
constitutions of the several States. In Magna Char-
ta, the basic principle of the right to jury trial is
more than once insisted on as the great bulwark of
English liberties." 31 Am Jur, Jury, § 3, pp 552,
553.

In the instant case the plaintiffs asked for and re-
ceived a trial by a jury of their peers. The jury by
its general verdict answered several questions in
plaintiffs' favor. As to one of them pertaining to
contributory negligence, we are here asked to find
that there was no issue of fact for jury decision and
that as a matter of law the plaintiff was guilty of
negligence which contributed as a proximate cause
to the happening of the accident. Defendant's ap-
peal urges that the trial judge was in error in fail-
ing to take this question from the jury or in failing
to render judgment for the defendant notwithstand-
ing the verdict of the jury.

With such motions before us for review we recite
the facts from a point of view favorable to plaintiffs,
since apparently that is the view the jury, as trier
of the facts, held to be the truth. *Canning* v. *Cun-
ningham,* 322 Mich 182; *Grover* v. *Simons,* 342 Mich
480.

Plaintiff Bishop, late on the night in question, was
driving home with his wife traveling east on a 4-
lane street in the city of Lansing and reached the
Shiawassee street-New York Central railroad cross-
ing. The automatic grade-crossing gate was down.
Flasher lights were working and a gong was ringing.
Plaintiff stopped his car in line behind another and
waited 9 to 10 minutes. A freight train eventually
passed. The gate went up. The lights stopped
flashing. The gong stopped ringing. The car ahead
started up. Plaintiff did likewise after looking to his

right and seeing nothing coming. He then drove across 3 tracks of the crossing and on the 4th was struck by a slow-moving freight train coming toward him from his right. He testified he had not looked again after he started across until just before the moment of impact.

The train which struck plaintiff was a switch engine which at the time was backing up with a string of loaded coal cars in tow.

Plaintiff was actually struck by the tender of the locomotive which had a 16-inch light affixed thereon.

Defendant's exhibits 1 and 4 are pictures of the scene of this accident. They show a railroad building built almost up to the sidewalk line and extending toward the crossing up to a line parallel to the automatic gate. They clearly portray a blind crossing up to the point of actual entrance onto the tracks.

Bearing also upon the problem of plaintiff's opportunity to observe is the following testimony from the gate tender (who controlled this gate for switching operations only) and who had just raised the gate after passage of the previous freight train:

"I heard the train reverse and then the engineer started to ring the bell and I put the gates down. I knew he was coming back from the noise, rather than from looking at him. I was located just about parallel to this gate, maybe set back a wee bit. From where I am looking down, it is kind of hard to tell whether he was coming back or not. There was a light on the train. Looking at the light you can hardly judge the speed of the train. It's hard to tell which way the car is going as a matter of fact. I knew he was coming back because the bell was going. When they ring the bell, that is a signal he is coming across, so I did what I thought was proper and released the gates."

Plaintiff's testimony apparently accepted by the jury was that he did not see the gate start down. Plaintiff also testified:

"In other words, when I am at those protected crossing gates, and they raise those gates, and the traffic begins moving, in other words, when they raise those gates and the lights quit blinking and the traffic starts moving, to me it indicates an all-clear sign, a signal to me."

With these facts in mind our question is, "Was there evidence from which this jury could have found plaintiff free from negligence which contributed as a proximate cause to the happening of this accident?"

The trial judge in dealing with defendant's motion for a judgment *non obstante veredicto* said upon this point:

"It is contended in that respect that plaintiffs offered no proofs showing freedom from contributory negligence, and further that plaintiff Bishop was guilty of contributory negligence as a matter of law. At a protected crossing an approaching traveler is entitled to place some reliance upon the indication of safety which the silence of the signals implies, and the degree of care required of one approaching a crossing under such circumstances is only that which an ordinarily prudent man would use under such circumstances. Whether proper care has been exercised under such circumstances is ordinarily a jury question but not necessarily so. It depends upon the circumstances of the particular case. See *Lockett* v. *Grand Trunk Western R. Co.*, 272 Mich 219, at p 223. Here when plaintiff Bishop approached the crossing the gates were down. He stopped and then they were raised and he then proceeded to cross without observation to his right. His car was struck by a slow-moving freight approaching from his right. We believe the act of raising the gates clearly distinguishes this case on the facts

from any of the cases cited by defendant, and further that such act raised a question of fact for the jury as to whether plaintiff Bishop acted as a reasonably prudent person would have acted under the same circumstances."

We agree with the trial judge that the facts in this case are plainly distinguishable from the line of Michigan cases cited by the defendant and relied on in Justice KELLY's opinion.

This was a protected crossing where by statute and order of the Michigan public service commission defendant was required to maintain and operate safety gates for the specific protection of the public. CL 1948, § 466.2 *et seq.* (Stat Ann § 22.261 *et seq.*).

Our Michigan courts from the earliest times have distinguished cases involving protected crossings from unprotected crossings. Very much in point in our instant situation are the words of Justice McGRATH in *Evans* v. *Lake Shore & Michigan Southern R. Co.,* 88 Mich 442, 446 (14 LRA 223):

"The testimony tended to show that the gateman had up to this time been present at his post, and that usually, when trains were approaching, the gate was closed, or dropped across the streetcar tracks. The gate-keeper was clearly negligent in leaving his post, knowing that the engine was approaching the crossing, without closing the gate, or giving some signal of danger. It has been frequently held that when gates are provided the public have a right, the gates being open, to presume, in the absence of knowledge to the contrary, that the gatemen were properly discharging their duties, and that it was not negligence on their part to act on the presumption that they were not exposed to a danger which could only arise from a disregard of their duties by the gatemen. *Glushing* v. *Sharp,* 96 NY 676; *Cleveland, C., C. & I. R. Co.* v. *Schneider,* 45 Ohio St 678 (17 NE 321)."

See, also, *Richmond* v. *Chicago & Western Michigan R. Co.*, 87 Mich 374.

In more recent years the same general holding has been reiterated repeatedly by this Court. Thus Justice CLARK, writing in relation to a pedestrian-railroad accident where the opportunity for observation was far greater than that available to the present plaintiff, said:

"Granting that one may not rely wholly on flagman, gates, or bell, but must take precaution for his own safety, he may place some reliance on such protection afforded at a crossing. We think it was for the jury to say whether the absence of the watchman and the lack of any signal from him might indicate to a reasonably prudent person that the crossing was clear for safe passage, whether the conduct of the watchman was an invitation to proceed. This view has obtained in case of a pedestrian (*Amedeo* v. *Grand Rapids & Indiana R. Co.*, 215 Mich 37), as in other cases.

"See *Day* v. *Pere Marquette R. Co.*, 252 Mich 589; *Tobias* v. *Michigan Central R. Co.*, 103 Mich 330; *Hudson* v. *Grand Trunk Western R. Co.*, 227 Mich 1 (23 NCCA 682); *Richmond* v. *Chicago & Western Michigan R. Co.*, 87 Mich 374; *Crawford* v. *Michigan Central R. Co.*, 207 Mich 159; note 53 ALR 973; note 23 NCCA 682; note 16 NCCA 110, 112." *Motyka* v. *Detroit, Grand Haven & Milwaukee R. Co.*, 253 Mich 647, 652, affirmed on rehearing, 256 Mich 417.

See, also, *Silanpa* v. *Thomson*, 309 Mich 326.

We believe the general rule in Michigan pertaining to the instant problem was best stated by Justice FEAD for a unanimous Court in *Balcer* v. *Pere Marquette R. Co.*, 266 Mich 538, 541:

"Where crossings are protected by gates which are not lowered, a driver approaching, nevertheless, must exercise due care. But the degree of care is influenced by the fact that the gates are not lowered.

An ordinarily prudent person puts some reliance on the position of the gates. Usually the question of negligence under such circumstances is for the jury. *Motyka* v. *Detroit, Grand Haven & Milwaukee R. Co.,* 256 Mich 417."

Justice Kelly relies upon *Beagle* v. *Pere Marquette R. Co.,* 184 Mich 17; *Lockett* v. *Grand Trunk Western R. Co.,* 272 Mich 219; and *Stone* v. *Duluth, South Shore & Atlantic R. Co.,* 248 Mich 538.

In the *Beagle Case* the plaintiff was a pedestrian. It was not a protected crossing.

In the *Lockett Case* the only protection at the crossing was flasher lights.

*Stone* involved a crossing where the gates were customarily not operated at night, at a time when and place where there was no duty to operate them imposed by either statute or ordinance.

By thus distinguishing these cases from the present one we do not necessarily infer approval of all that is said in them as to unprotected crossings as becomes obvious below. But we do not believe that any of these cases is comparable to the instant case of a protected crossing where the gates were obviously in operation. (See, also, *Davis* v. *New York Central R. Co.,* 348 Mich 262, decided this same date.)

Defendant and appellant relied in argument and brief upon the cases thus distinguished above plus *Rosencranz* v. *Michigan Central R. Co.,* 244 Mich 137. This latter case is distinguished from the instant one by the fact that the crossing was wholly unprotected and plaintiff there was traveling upon a private roadway.

*Rosencranz* does, however, represent the greatest invasion of the powers of the jury as finders of fact on the issue of contributory negligence in railroad crossing cases in Michigan case law, for the Court

there reversed a jury verdict for plaintiff on the following ground (p 139) :

"While in a zone of safety plaintiff was unable, without stopping, to see whether he could safely proceed. He should have stopped, looked, and listened and, if necessary, have gotten out of his automobile and made observation. He did not stop, and, without being able to see whether the way was clear, drove into the path of the locomotive."

Some investigation of the background of this phraseology indicates that it came from dictum in a United States supreme court opinion (*Baltimore & Ohio R. Co.* v. *Goodman,* 275 US 66 [48 S Ct 24, 72 L ed 167, 56 ALR 645]), dated 1927 and authored by no less distinguished person than Justice Oliver Wendell Holmes. This view was apparently adopted by the Michigan Supreme Court and stated in cases applying to unprotected railroad crossing accidents. Defendant and appellant would now have this Court likewise apply this as the standard of ordinarily prudent conduct at railroad crossings in a major city protected by statutorily-required railroad gates.

We feel compelled to point out that although this rule had the distinguished origin which we have noted, by 1934 it had been discredited by the court which gave it birth. In *Pokora* v. *Wabash Railway Co.,* 292 US 98 (54 S Ct 580, 78 L ed 1149, 91 ALR 1049), Justice Cardozo and a unanimous court for all practical purposes overruled the *Goodman Case.* Cardozo said (pp 104–106) :

"His case was for the jury unless as a matter of law he was subject to a duty to get out of the vehicle before it crossed the switch, walk forward to the front, and then, afoot, survey the scene. We must say whether his failure to do this was negligence so obvious and certain that one conclusion and one

only is permissible for rational and candid minds. *Grand Trunk R. Co.* v. *Ives,* 144 US 408 (12 S Ct 679, 36 L ed 485).

"Standards of prudent conduct are declared at times by courts, but they are taken over from the facts of life. To get out of a vehicle and reconnoitre is an uncommon precaution, as everyday experience informs us. Besides being uncommon, it is very likely to be futile, and sometimes even dangerous. If the driver leaves his vehicle when he nears a cut or curve, he will learn nothing by getting out about the perils that lurk beyond. By the time he regains his seat and sets his car in motion, the hidden train may be upon him. See, *e. g., Torgeson* v. *Missouri K. T. R. Co.,* 124 Kan 798, 800, 801 (262 P 564, 55 ALR 1335, 27 NCCA 126); *Dobson* v. *St. Louis, S. F. R. Co.,* 223 Mo App 812 (10 SW2d 528); *Key* v. *Carolina & N. W. R. Co.,* 150 SC 29, 35 (147 SE 625); *Georgia Railroad & Banking Co.* v. *Stanley,* 38 Ga App 773, 778 (145 SE 530). Often the added safeguard will be dubious though the track happens to be straight, as it seems that this one was, at all events as far as the station, about 5 blocks to the north. A train traveling at a speed of 30 miles an hour will cover a quarter of a mile in the space of 30 seconds. It may thus emerge out of obscurity as the driver turns his back to regain the waiting car, and may then descend upon him suddenly when his car is on the track. Instead of helping himself by getting out, he might do better to press forward with all his faculties alert. So a train at a neighboring station, apparently at rest and harmless, may be transformed in a few seconds into an instrument of destruction. At times the course of safety may be different. One can figure to oneself a roadbed so level and unbroken that getting out will be a gain. Even then the balance of advantage depends on many circumstances and can be easily disturbed. Where was Pokora to leave his truck after getting out to reconnoitre? If he was to leave it on the switch, there was the possibility that the box cars would

be shunted down upon him before he could regain his seat. The defendant did not show whether there was a locomotive at the forward end, or whether the cars were so few that a locomotive could be seen. If he was to leave his vehicle near the curb, there was even stronger reason to believe that the space to be covered in going back and forth would make his observations worthless. One must remember that while the traveler turns his eyes in one direction, a train or a loose engine may be approaching from the other.

"Illustrations such as these bear witness to the need for caution in framing standards of behavior that amount to rules of law. The need is the more urgent when there is no background of experience out of which the standards have emerged. They are then, not the natural flowerings of behavior in its customary forms, but rules artificially developed, and imposed from without. Extraordinary situations may not wisely or fairly be subjected to tests or regulations that are fitting for the common-place or normal. In default of the guide of customary conduct, what is suitable for the traveler caught in a mesh where the ordinary safeguards fail him is for the judgment of a jury. *Dolan* v. *Delaware & Hudson Canal Co.*, 71 NY 285, 288, 289; *Davis* v. *New York Central & Hudson River R. Co.*, 47 NY 400, 402. The opinion in *Goodman's Case* has been a source of confusion in the Federal courts to the extent that it imposes a standard for application by the judge, and has had only wavering support in the courts of the States. We limit it accordingly."

As has been noted above, although the majority of the States, in addition to the United States supreme court, have followed Justice Cardozo's logic, annotations, 56 ALR 647, 91 ALR 1055, Michigan has continued to rely upon the earlier overruled *Goodman Case. Greenfield* v. *Duluth, South Shore*

& Atlantic R. Co., 268 Mich 277; Lockett v. Grand Trunk Western R. Co., 272 Mich 219.

In the early history of these railroad cases in Michigan and in other States we find great tendency to take judicial notice of the importance of railroad traffic, and the demand from the public for high-speed and regular schedules thereon. Lake Shore & Michigan Southern R. Co. v. Miller, 25 Mich 274, at pages 291-294; Lockett v. Grand Trunk Western R. Co., supra, 225. In a fact situation involving the latter half of the twentieth century it seems to us desirable to take judicial notice of a tremendously increased importance of automobile traffic during the first half of this century.

For this Court at this time to hold that there is a duty imposed upon the ordinarily prudent person in our society to stop his car at every railroad crossing, protected or unprotected, where complete observation is not otherwise possible, and to descend therefrom and proceed to make an inspection of railroad tracks, on foot, prior to driving across the crossing would be to fly in the face of all present-day experience and common sense. It takes only the most casual thought to recognize that if for 1 day the automobile drivers in 1 of our large cities adhered to such a rule, all economic life in that city would be disrupted completely. It likewise is obvious that the consequent hazard in interference with emergency operations of police, fire department and medical vehicles, by massive traffic jams, would occasion dangers far exceeding those which certainly do exist at railroad crossings.

This we believe to be illustrative of the importance of following the accepted rules pertaining to contributory negligence which generally allow a jury to determine the care to be demanded from an ordinarily prudent person under a given set of facts. 65 CJS, Negligence, §§ 254, 255. When a court lays

down such a standard relating to a specific fact situation as a matter of law, it may well be judicially reiterated for many years after the conditions in the community have completely changed and the people in the community have long since, due to changed circumstances, abandoned the previously valid standard.

The jury is drawn from the community. It lives, and thinks, and decides, with the standards of conduct of the ordinarily prudent persons in that community as of the time in question uppermost in its collective mind. It is a part of the genius of our system of law that a jury trial inevitably brings into each case thus decided the color of life in the county or city concerned, the habits of the people who dwell there, and the ordinary standards of conduct of those folks in relation to the problems of their day and time.

The above is not to suggest that there may not be cases where jury awards go beyond the valid evidence in the record, or where the judge or the appellate court may not properly say that reasonable minds cannot differ upon a contrary conclusion to that which a jury has found. Such cases, we believe to be a distinct exception. And certainly, on the facts previously referred to, no such exception is presented here.

We hold that on this record whether plaintiff's conduct on the night of the accident in proceeding across this railroad crossing after the safety gates were raised for him, with such observation as has been noted, constituted negligence which contributed as a proximate cause to the happening of his injury was a question of fact for the jury. We hold that there was competent evidence to sustain the award. We hold further that the trial judge was correct in denying motions for a directed verdict and for a judgment *non obstante veredicto*.

The judgment of the circuit court is affirmed, with costs to appellee.

Smith and Black, JJ., concurred with Edwards, J.

Dethmers, C. J., and Sharpe and Carr, JJ., concurred in affirmance.

Voelker, J., took no part in the decision of this case.